**130 Nev., Advance Opinion 26**
IN THE SUPREME COURT OF THE STATE OF NEVADA

RAYSHAUN COLEMAN,
Appellant,
vs.
THE STATE OF NEVADA,
Respondent.

No. 60181

**FILED**

APR 03 2014

TRACIE K. LINDEMAN
CLERK OF SUPREME COURT
BY _____
CHIEF DEPUTY CLERK

Appeal from a judgment of conviction, pursuant to a jury verdict, of first-degree murder. Eighth Judicial District Court, Clark County; Michael Villani, Judge.

*Reversed and remanded.*

David M. Schieck, Special Public Defender, and JoNell Thomas, Deputy Special Public Defender, Clark County,
for Appellant.

Catherine Cortez Masto, Attorney General, Carson City; Steven B. Wolfson, District Attorney, Steven S. Owens, Chief Deputy District Attorney, and Giancarlo Pesci, Deputy District Attorney, Clark County,
for Respondent.

---

BEFORE HARDESTY, PARRAGUIRRE and CHERRY, JJ.

*OPINION*

By the Court, CHERRY, J.:

Appellant Rayshaun Coleman was convicted of first-degree murder by child abuse following the death of an infant, Tristen Hilburn.

SUPREME COURT
OF
NEVADA

(O) 1947A

8/29/14: Corrected per letter to publishers. CJ

14-10525

Tristen was the victim of multiple injuries, many of which occurred days and weeks prior to the day of his death. Coleman insists that he is innocent and that the injuries were inflicted by his girlfriend, Tristen's mother Crystal Hilburn Gaynor, or others associated with her, including her methamphetamine-addicted brother. In this appeal, Coleman challenges the constitutionality of NRS 51.345, the statement-against-interest exception to the hearsay bar, the district court's exclusion of defense witnesses, and jury instructions on the felony-murder rule and child abuse.

In resolving Coleman's appeal, we conclude that NRS 51.345 is constitutional but clarify that the standard for admissibility of a statement against penal interest offered to exculpate an accused—"corroborating circumstances [that] clearly indicate the trustworthiness of the statement"—must not be so rigorously applied that it ignores the purpose for the rule and instead infringes the defendant's constitutional right to a meaningful opportunity to present a complete defense. We conclude that the district court, in applying this provision, abused its discretion by refusing to permit two defense witnesses to testify about admissions made by Gaynor concerning a methamphetamine explosion and resulting burns to Tristen's body. In reversing this portion of the decision, we take the opportunity to clarify the relevant considerations for identifying the corroboration necessary to support the admission of a hearsay statement under NRS 51.345. We also conclude that the instructions were not in error.

*FACTS*

This case stems from the death of Tristen on Sunday, March 8, 2009, when he was just six weeks old. While Tristen was healthy and alert at birth, Gaynor indicated that Tristen had breathing issues to the

point where he had stopped breathing and turned blue. Despite this and the fact that he was small and had a weak cry, he was never taken to a doctor because of a lack of health insurance. At the time of Tristen's death, Gaynor lived in a house with her brother Brian Harris, her five-year-old son Devin, and her then-boyfriend Coleman. During this time period, Brian was using methamphetamine on a daily basis. To support his addiction, Brian would often act as a middleman, procuring drugs for acquaintances and receiving either money or drugs in return. It was not uncommon for these acquaintances to stop by the house to either purchase drugs from, or do drugs with, Brian. Brian sometimes took care of Devin, but he was not entrusted with the care of Tristen. On the day of Tristen's death, Brian spent much of the day in and out of the house with friends, pursuing and using methamphetamine.

In Tristen's six weeks of life, Gaynor left him with Coleman on three weekends, including the final weekend of Tristen's life. Tristen was in Coleman's care that weekend because Gaynor was incarcerated for an unrelated misdemeanor domestic violence conviction. Gaynor was home that Friday and early Saturday morning, but turned herself in at the jail around 8 a.m. on Saturday, March 7, 2009. When Coleman watched Tristen, he would keep Tristen in the master bedroom with the door closed and locked. Although a crib was available, Tristen slept between the couch cushions.

Coleman called 911 on the night of Tristen's death. He met the responding officers at the door and directed them to the back bedroom. Besides the emergency personnel, the only individuals in the house were Tristen, Coleman, and Devin. Upon entering the master bedroom, the responding officers found Tristen lying on the floor, unconscious, and not

breathing. Tristen was cold to the touch but was not stiff. A number of responders testified to observing red blotches or burns on Tristen's face and body. Many also noted that the burns appeared to be recent. Responders performed CPR, but it was unsuccessful and Tristen was pronounced dead. Officers on the scene found Tristen's blood and pieces of sloughed skin around the house.

Examination of Tristen's body revealed that he suffered from many health issues and injuries at the time of his death that indicated that he had been abused and neglected. He was extremely small and malnourished, weighing only five and a half pounds (less than he weighed at birth). His brain was small and swollen and some of the brain tissue was dead. Due to the damage to his brain, Tristen may have had problems crying and feeding. Although no tests were conducted to determine bone density, the medical examiner indicated that Tristen likely did not get enough calcium in his diet, which would have affected the density of his bones. Tristan also suffered numerous physical injuries. There were debrided first- to second-degree burns across approximately 36 percent of his body, two skull fractures as the result of blunt force trauma, fresh bleeding in the muscles of his back, and multiple fractured ribs consistent with blunt force trauma. The cause of death was determined to be inflicted head injuries and burns with starvation contributing to the death, and the manner of death to be homicide.

The investigation focused on Coleman. According to the medical examiner, it was not possible for the lethal burns or skull fractures to have been inflicted before 10;00 a.m. on Saturday, March 7, 2009, because there was no evidence of healing. This evidence suggested that the injuries were inflicted while Tristen was in Coleman's care;

however, the healing process used to determine the time of injury can be affected by a person's strength and the injuries, and in this case, Tristen's immune system appeared to be inactive at the time of his death due to stress and inadequate nutrition. When he was questioned on the day that Tristen died, Coleman initially gave officers a false name. When asked what had happened, Coleman said that he had bathed Tristen and put him down to sleep. He indicated that he then also fell asleep and when he woke he found Tristen unresponsive and with skin peeling from his burns. There was some evidence that the burns could have happened when Coleman bathed Tristen: the temperature of the hot water in the house reached 131 degrees and a crime scene analyst observed that the hot and cold faucets in the bathtub were reversed.

The State charged Coleman with one count of murder by child abuse and two counts of child abuse and neglect with substantial bodily harm. It also charged Gaynor with one count of child neglect with substantial bodily harm. Both pleaded not guilty. The trials were severed, and the State filed a notice of intent to seek the death penalty against Coleman. The State subsequently filed an amended information in which it solely charged Coleman with murder by child abuse.

Before trial, Coleman's counsel informed the court that he intended to call three female witnesses who had been incarcerated with Gaynor. These witnesses would testify about statements allegedly made by Gaynor about burns that both she and Tristen suffered after being splashed by cooking methamphetamine. The State objected to the testimony on hearsay grounds, and Coleman argued that the statements were admissible as statements against interest and pointed out that the statements were exculpatory and relevant as to bias and a lack of

investigation. The district court held an evidentiary hearing and ultimately found that the statements were exculpatory as to both Gaynor and Coleman, but were so lacking in any indicia of trustworthiness that they could not be admitted as statements against penal interest under NRS 51.345. Coleman's attorney later lodged a complaint on the record alleging potential due process issues with NRS 51.345.

After Coleman's trial began, instructions were proposed on the felony-murder rule and child abuse. Coleman's counsel objected to the use of the term "accidental" as being confusing given the nonaccidental statutory definition of child abuse under the felony-murder rule in NRS 200.030. The State argued that the instruction was accurate given that the killing can be accidental while the physical injury must be nonaccidental. The district court allowed the instruction unaltered.

During the culpability phase of the trial, the jury ultimately found Coleman guilty of first-degree murder by child abuse. In the penalty phase of the trial, one or more of the jurors found several mitigating circumstances, including an "[a]bsence of intent to cause death" and "[i]nvolvement of others in injuries to Tristen." The jury did not find the aggravating circumstance of mutilation of the victim. It found that the mitigating circumstances outweighed the single aggravating circumstance (the victim's age), and imposed a sentence of life with the possibility of parole after 20 years. Coleman now appeals from the judgment of conviction.

## DISCUSSION

*Sufficiency of the evidence*

Coleman argues that there is insufficient evidence to support the conviction of first-degree murder by child abuse. Coleman argues that his constitutional rights to due process of law, equal protection, a fair trial,

and conviction based upon only evidence establishing guilt beyond a reasonable doubt were violated. Coleman points out that the State failed to prove that he inflicted the fatal injuries and that the death was not accidental. In response, the State argues that the evidence presented, viewed in a light most favorable to it, clearly established each element of first-degree murder by child abuse beyond a reasonable doubt.

Because "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *Rose v. State*, 123 Nev. 194, 202, 163 P.3d 408, 414 (2007) (internal quotations omitted), we conclude that sufficient evidence supported the verdict. While others were in the house the weekend of Tristen's death, Coleman was the only adult present when Tristen died. Additionally, while testimony provided that Coleman did a good job of caring for Tristen, Tristen was seriously abused from the time of his birth. The abuse was so severe that Tristen's brain was not developing normally, parts of it were dead, and it had shrunk since his birth. Tristen was malnourished, suffered from head and rib fractures, had been burned, and his immune system was not functioning. While the cause of the burns was unknown, Coleman indicated that he had bathed Tristen and put him to bed before he stopped breathing. The medical examiner acknowledged that the burns could have been caused by abnormally hot water found in the house and evidence established that the faucets on the tub were reversed. There was no testimony establishing how the fractures were inflicted, but Coleman was alone with Tristen all weekend. The medical testimony, while inconsistent, supported that the burns and fractures occurred while Coleman was alone with Tristen. And the medical examiner concluded

that Tristen died of the burns and fractures. Viewing the evidence in the light most favorable to the prosecution, we conclude that the evidence presented could lead a rational trier of fact to conclude that Coleman abused Tristen and that abuse led to his death. *See Deveroux v. State*, 96 Nev. 388, 391, 610 P.2d 722, 724 (1980) (noting that "circumstantial evidence alone may sustain a conviction").

*The exclusion of testimony from three defense witnesses*

Coleman next attacks the constitutionality of NRS 51.345 and argues that even if the statute is constitutional, reversal is still warranted because the exclusion of the defense witnesses' testimony about Gaynor's statements was an abuse of discretion. Coleman contends that Gaynor's statements would subject her to criminal liability for child neglect and were trustworthy based on corroborating circumstances, and that their exclusion was highly prejudicial.

*Constitutionality of NRS 51.345*

Coleman argues that NRS 51.345 is unconstitutional because it subjects certain exculpatory hearsay statements to a trustworthiness determination based on corroborating circumstances that does not apply to similar inculpating statements offered by the State.[1] Coleman also avers that the statute arbitrarily allows the district court to preclude defense

---

[1]The federal counterpart to NRS 51.345, Federal Rule of Evidence 804(b)(3), was amended in 2010 to make the requirement of corroborating circumstances apply to all declarations against penal interest in criminal cases.

evidence based upon a trustworthiness determination that should be decided by a jury rather than a judge.[2]

We review a challenge to the constitutionality of a statute de novo. *Aguilar-Raygoza v. State*, 127 Nev. ___, ___, 255 P.3d 262, 264 (2011). "Because statutes are presumed to be valid, [the challenger] bears the heavy burden of demonstrating that [the statute] is unconstitutional." *Id.* at ___, 255 P.3d at 264.

Hearsay is an out-of-court statement "offered in evidence to prove the truth of the matter asserted," NRS 51.035, and is inadmissible unless within an exemption or exception. NRS 51.065. Hearsay evidence has traditionally been excluded because it is not subject to the usual method to test the declarant's credibility, since cross-examination to ascertain a declarant's perception, memory, and truthfulness is not available. *Deutscher v. State*, 95 Nev. 669, 684, 601 P.2d 407, 417 (1979). Based on these concerns, additional requirements have been placed on hearsay statements before they may be admitted. *Chambers v. Mississippi*, 410 U.S. 284, 298-99 (1973) ("The hearsay rule, which has long been recognized and respected by virtually every State, is based on experience and grounded in the notion that untrustworthy evidence should not be presented to the triers of fact. . . . A number of exceptions have developed over the years to allow admission of hearsay statements made under circumstances that tend to assure reliability and thereby

---

[2]The State argues that this issue was not preserved for appeal. We disagree and conclude that the issue was preserved by the argument below that the statute is unconstitutional and fundamentally unfair in violation of due process because the defendant is held to a different standard for the admission of hearsay evidence.

 

compensate for the absence of the oath and opportunity for cross-examination."). A statement against interest is excepted from the hearsay bar and is admissible, provided that the statement, at the time it is made:

> (a) Was so far contrary to the pecuniary or proprietary interest of the declarant;
>
> (b) So far tended to subject the declarant to civil or criminal liability;
>
> (c) So far tended to render invalid a claim by the declarant against another; or
>
> (d) So far tended to make the declarant an object of hatred, ridicule or social disapproval,
>
> that a reasonable person in the position of the declarant would not have made the statement unless the declarant believed it to be true.

NRS 51.345(1). An additional requirement is imposed when a statement "tending to expose the declarant to criminal liability [is] offered to exculpate the accused in a criminal case." *Id.* Such a statement "is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement." *Id.*

Coleman asserts that *Holmes v. South Carolina*, 547 U.S. 319 (2006), controls the constitutionality assessment of NRS 51.345. In *Holmes*, the United States Supreme Court addressed the constitutionality of "an evidence rule under which the defendant may not introduce proof of third-party guilt if the prosecution has introduced forensic evidence that, if believed, strongly supports a guilty verdict." 547 U.S. at 321. The United States Supreme Court began by noting that while the Constitution provides state and federal rulemakers with broad latitude to establish exclusionary rules for evidence in criminal trials, that latitude is limited by the Constitution's guarantee that a criminal defendant must have "a meaningful opportunity to present a complete defense." *Id.* at 324

(internal quotations omitted). The Court stated that "[t]his right is abridged by evidence rules that infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve." *Id.* (internal quotations omitted).

However, the Court clarified that "well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Id.* at 326. The Court then critiqued the evidentiary rule at issue based on its focus on the strength of the prosecution's case regardless of the credibility of the prosecution's witnesses or the reliability of its evidence and without considering the probative value of the proffered defense evidence. *Id.* at 329. The Supreme Court concluded that the evidentiary rule did not "rationally serve the end that . . . [it was] designed to promote, *i.e.*, to focus the trial on the central issues by excluding evidence that has only a very weak logical connection to the central issues." *Id.* at 330. As a result, the Court held that the rule was arbitrary and violated the defendant's right to a meaningful opportunity to present a complete defense. *Id.* at 331.

We conclude that *Holmes* is not dispositive, as the exclusion of the hearsay statements was not predicated on evidence of Coleman's guilt but was based on NRS 51.345(1)'s requirement that "[a hearsay] statement tending to expose the declarant to criminal liability and offered to exculpate the accused in a criminal case is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement." Moreover, in critiquing the evidentiary rule at issue in *Holmes*, the Court indicated that rules based on the credibility of the witnesses or the reliability of the evidence would be proper. *Cf.* 547 U.S.

at 329. Thus, *Holmes* actually supports the constitutionality of NRS 51.345(1).

Another court has addressed a similar challenge to an evidentiary rule that is identical to NRS 51.345(1). In *Summers v. State*, 231 P.3d 125, 141 (Okla. Crim. App. 2010), the defendant argued that his right to a fair trial was violated when the trial court refused to let him present a witness's testimony that the witness ordered a third party to kill the victims and that the third party made incriminating statements to the witness that exculpated the defendant. The trial court determined that the testimony could not be admitted as it was hearsay and the defense failed to provide clear, corroborating circumstances that would indicate the trustworthiness of the statement. *Id.* at 144-45. The appellate court expressed concern that the evidentiary rule, which required corroborating circumstances establishing the trustworthiness of a statement against penal interest offered to exculpate a defendant, could violate a defendant's constitutional rights. *Id.* at 148. In particular, if a court holds the defense evidence to too high of a standard under the rule, "application of this seemingly reasonable standard could, in fact, violate the defendant's right to a meaningful opportunity to present his defense." *Id.* The court explained that while courts have traditionally treated out-of-court statements that tend to exonerate the defendant and implicate the declarant with great suspicion, that concern does not "fully comport with the later-developed, but now well-established doctrine regarding the defendant's right to a meaningful opportunity to present his defense." *Id.* "Such a rule, at least when too rigorously applied, would appear to be 'disproportionate' to the (reliability) end that it is intended to promote, since it subjects the defendant's evidence to a more demanding

admissibility evaluation than it does the State's." *Id.* at 148-49. Despite its concerns, the court did not "question the validity, in general, of this well-established evidentiary rule." *Id.* at 148.

We find the observations in *Summers* to be persuasive and agree with the Oklahoma court's concerns about the constitutional implications of the standard for admissibility of statements against penal interest that are offered to exculpate a defendant. In applying the evidentiary rule, the court must balance fabrication concerns with the constitutional right to have a meaningful opportunity to present a complete defense. *See Holmes*, 547 U.S. at 324 (stating that a defendant is constitutionally guaranteed "a meaningful opportunity to present a complete defense" (internal quotations omitted)); *Woods v. State*, 101 Nev. 128, 132, 696 P.2d 464, 467 (1985) (explaining that the drafters of the federal rule analogous to NRS 51.345 expressed concern about fabrication). Our prior decisions applying NRS 51.345 reflect that careful balance. We have explained that "the statutory test for determining the admissibility of statements against penal interest under NRS 51.345 is whether the totality of the circumstances indicates the trustworthiness of the statement or corroborates the notion that the statement was not fabricated to exculpate the defendant." *Walker v. State*, 116 Nev. 670, 676, 6 P.3d 477, 480 (2000). Our caselaw does not apply NRS 51.345 so rigorously as to hold the defendant to a standard that is disproportionate to the statute's intended goal of providing reliability or unfairly burdens the defendant's constitutional rights. It also balances the principle that the reliability of relevant testimony typically falls within the province of the jury, *Kansas v. Ventris*, 556 U.S. 586, 594 n.* (2009), with the need to "compensate for the absence of the oath and opportunity for cross-

examination," *Chambers*, 410 U.S. at 299, that is at the heart of exceptions to the hearsay rule such as NRS 51.345(1). Accordingly, based on the balanced approach required to assess whether the statements against penal interest should be admitted, NRS 51.345 is not unconstitutional.

*Application of NRS 51.345 to this case*

Coleman contends that reversal is warranted because the prohibition of the witnesses' testimony was an abuse of discretion as Gaynor's statements would subject her to child neglect charges, were corroborated and trustworthy, and the exclusion of the evidence was not harmless. We agree. The district court abused its discretion in failing to allow the testimony from two of the three witnesses.

While the application of NRS 51.345 is within the district court's discretion, we will reverse the decision if it is an abuse of discretion, meaning that the "decision is arbitrary or capricious or if it exceeds the bounds of law or reason." *Jackson v. State*, 117 Nev. 116, 120, 17 P.3d 998, 1000 (2001); *Sparks v. State*, 104 Nev. 316, 320-21, 759 P.2d 180, 183 (1988).

*The statements*

The content of the proffered testimony is critical to our review of the district court's evidentiary decision. Two of the proposed defense witnesses (Erica Antolick and Dawn Makaroplos) testified in an offer of proof outside the presence of the jury. Erica Antolick testified regarding two statements made by Gaynor that the defense offered to exculpate Coleman with respect to the burns suffered by Tristen. First, sometime in 2009, she overheard Gaynor say that while cooking methamphetamine with her brother the mixture exploded and Tristen was splashed. Erica asked what happened when the mixture exploded and Gaynor became

defensive, yelled, and very quickly lifted up her shirt to the extent that she could with her shackles. Erica stated that Gaynor's skin appeared red. Erica never heard Gaynor say that the baby suffered any burns, nor did she hear Gaynor discuss how or why Tristen died. Erica also admitted that she had no idea when the burning incident supposedly took place. Second, during a transport ride to court, Erica overheard Gaynor talking with Coleman and indicating that she knew that Coleman did not murder Tristen and that her brother did it. Erica also mentioned the fact that Tristen slept between the couch cushions. Erica admitted that she disliked Gaynor and had even requested a transfer to a separate unit because they did not get along. At the time of the hearing, Erica was on probation after having been convicted of felony forgery.

Dawn Makaroplos, who was Gaynor's friend, also testified about similar statements made by Gaynor that the defense offered to exculpate Coleman with respect to the burns. Dawn indicated that she saw scabs on Gaynor's chest in jail. When she asked Gaynor what happened, Gaynor stated that she and her infant were burned and that her infant had died as a result. Eventually, Gaynor opened up to Dawn and, while crying, said that "her brother was batching meth and she was feeding the baby and the pot exploded over the stove." After Gaynor admitted to having burn marks, Dawn said, "[w]ell, if you're feeding, then the baby got burn marks. . . . So how bad was the baby?" Gaynor would not acknowledge the question. Dawn admitted that Gaynor started crying every time she asked if the baby got burned, so she never obtained a direct answer from Gaynor. She nevertheless maintained that Gaynor stated that she had been holding the baby. Dawn stated that Gaynor told her that the burn happened the Friday before the baby's death and that

Coleman was wrongly in jail for killing Tristen. According to Dawn, Gaynor indicated that it was her brother's fault. Dawn testified that Gaynor talked to and confided in her because everyone else in jail called Gaynor a baby killer. Dawn expressed some resentment toward Gaynor, as Dawn was fighting for custody of her daughter at the time and Gaynor was crying about her five-year-old when she had "killed a newborn." Upon learning that Coleman had been living in Gaynor's house, Dawn admitted that those were not the facts Gaynor told her. Gaynor had told her that Coleman came from California to watch Tristen. Dawn also referenced the fact that Gaynor said Tristen slept on the couch.

The district court excluded this testimony after concluding that Gaynor's statements were not against penal interest and were so lacking in any indicia of trustworthiness that they could not be admitted under the NRS 51.345 hearsay exception. We address each of these determinations in turn.

### Potential for criminal liability

The district court emphasized that Gaynor's statements were not self-incriminating. We disagree. Gaynor's alleged statements that she was holding her baby next to where her brother was cooking methamphetamine, resulting in splatter burns, tended to subject her to additional criminal liability for child abuse or child neglect as she admitted to holding a newborn next to highly explosive toxic substances. *See* NRS 200.508(1) (a person is guilty of child abuse if he or she "willfully causes a child who is less than 18 years of age to suffer unjustifiable physical pain or mental suffering as a result of abuse or neglect or to be placed in a situation where the child may suffer physical pain or mental suffering as the result of abuse or neglect"); NRS 200.508(2) (a person is guilty of child neglect if he or she "permits or allows that child to suffer

unjustifiable physical pain or mental suffering as a result of abuse or neglect or to be placed in a situation where the child may suffer physical pain or mental suffering as the result of abuse or neglect"); NRS 200.508(4)(a) ("'Abuse or neglect' means physical or mental injury of a nonaccidental nature, sexual abuse, sexual exploitation, negligent treatment or maltreatment of a child under the age of 18 years, . . . under circumstances which indicate that the child's health or welfare is harmed or threatened with harm."); *see also In re A.K.*, 696 N.W.2d 160, 161 (N.D. Ct. App. 2005) (noting the mother's conviction for methamphetamine-related offenses and child abuse and neglect, following a fire that resulted in severe burning of the child). Accordingly, the district court erred in determining that the statement did not tend to subject Gaynor to criminal liability.

*Corroborating circumstances and trustworthiness*

In determining that there were not sufficient corroborating circumstances to indicate the trustworthiness of Gaynor's statements, the district court noted that the statements were not made to a friend in the comfort of a private residence, but were made in jail and in a transportation van. Also, Gaynor was already implicated in the underlying crime at the time the statements were made, rendering them less trustworthy. Although these are relevant considerations, Coleman presented evidence sufficient to warrant a finding of trustworthiness regarding Gaynor's statements presented by Erica and Dawn.

Discussing the difficulties in precisely identifying the corroboration necessary to support the admission of a hearsay statement, the Fourth Circuit Court of Appeals has recognized several factors that are relevant to the inquiry. Specifically,

(1) whether the declarant had at the time of making the statement pled guilty or was still exposed to prosecution for making the statement, (2) the declarant's motive in making the statement and whether there was a reason for the declarant to lie, (3) whether the declarant repeated the statement and did so consistently, (4) the party or parties to whom the statement was made, (5) the relationship of the declarant with the accused, and (6) the nature and strength of independent evidence relevant to the conduct in question.

*United States v. Kivanc*, 714 F.3d 782, 792 (4th Cir. 2013) (quoting *United States v. Bumpass*, 60 F.3d 1099, 1102 (4th Cir. 1995)). Other courts have included for consideration (7) whether the statement was made voluntarily after *Miranda* warnings, *United States v. Nagib*, 56 F.3d 798, 805 (7th Cir. 1995); *United States v. Price*, 134 F.3d 340, 348 (6th Cir. 1998), (8) "whether there is any evidence that the statement was made in order to curry favor with authorities," *Nagib*, 56 F.3d at 805, and (9) the spontaneity of the statement, *United States v. Thomas*, 571 F.2d 285, 290 (5th Cir. 1978).

At the time that the statements were made by Gaynor to Erica and Dawn, Gaynor was exposed to prosecution for child abuse and presumably had been given her *Miranda* warnings. She became very upset after mentioning the splashing methamphetamine and reacted emotionally by starting to cry or becoming angry. Gaynor also spontaneously made, and repeated, these statements to both witnesses.

Gaynor was in a relationship with Coleman, giving her a reason to lie to protect him. However, due to the emotionally charged nature of her utterances and their inculpatory nature, the motive behind making the statements is unclear.

Taking into consideration the parties to whom the statement was made, it is apparent that neither Erica nor Dawn had a clear motive to fabricate the statements. *See Woods v. State*, 101 Nev. 128, 133, 696 P.2d 464, 467 (1985) ("In determining whether the declarant in fact made the proffered statement, the trial court may consider the credibility of the witness."). They were not promised any deals or benefits for their testimony such as a plea bargain or reduction in sentence. *See Walker*, 116 Nev. at 676, 6 P.3d at 481 (pointing out that the lack of an advantage accrued in exchange for the testimony supported a trustworthiness finding); *Woods*, 101 Nev. at 135, 696 P.2d at 469 (same). Although Dawn harbored some resentment toward Gaynor concerning child custody issues, she considered Gaynor a friend, providing an indicia of trustworthiness. *See Walker*, 116 Nev. at 676, 6 P.3d at 481 ("[I]t is well-settled that a statement against interest made to a close friend or relative is considered to be more reliable than a statement made to a stranger."). We acknowledge, however, that Erica admitted to not liking Gaynor, which may have given her some incentive to fabricate the statements. But considering the other corroborating circumstances that indicate the trustworthiness of the statements, we are not convinced that this possibility warrants excluding the testimony.

We conclude that the nature and strength of independent evidence relevant to the conduct in question support the admission of Gaynor's statements. The statements were focused on Brian's undisputed involvement with methamphetamine. Although the statements were contradicted by Coleman's statements that Tristen was fine before his death, Coleman's statements were less than trustworthy as, at the time, he was attempting to protect himself, as evidenced by the use of a false

SUPREME COURT
OF
NEVADA

(O) 1947A

name. Erica and Dawn both saw burns on Gaynor's torso, corroborating Gaynor's statements.[3] Erica and Dawn also both knew of the obscure fact that Tristen slept on the couch, indicating that Gaynor must have told them of this detail, corroborating the fact that conversations occurred between them about Tristen. These circumstances corroborate the hearsay statements and were not sufficiently considered by the district court.

In evaluating the corroborating circumstances, the district court also observed that the medical evidence showed that Tristen's burns could not have occurred before Gaynor reported to jail on the morning of Saturday, March 7, 2009. But the evidence concerning Tristen's burns conflicted with the evidence of his lack of a functioning immune system and inability to heal. The inconsistency of these findings would allow for a jury to determine that the burns could have taken place on the Friday before Tristen's death.

Considering the corroborating circumstances, we conclude that the district court abused its discretion in excluding the testimony from Erica and Dawn concerning Gaynor's statements about the burns. Any discrepancies with other evidence should be left to the jury to assess. *Woods*, 101 Nev. at 136, 696 P.2d at 469-70 (stating that it is "for the jury to evaluate [the] story and to decide how much credence it should be

---

[3]While no other testimony directly corroborated the burns, the detective did not see Gaynor's chest and did not make any attempt to see the area even after having discussed the burns with Dawn. The detective also failed to report his conversation with Dawn and failed to follow up on Dawn's statements to the police.

given"). Accordingly, the district court abused its discretion in excluding the testimony of Dawn and Erica on this ground.

However, we conclude that the district court did not abuse its discretion in refusing to admit the testimony of the third defense witness. Coleman's counsel proffered that the third witness's testimony would be similar to Erica's testimony concerning the batching of methamphetamine and the explosion. However, the third witness was unable to attend the evidentiary hearing. Thus, the record is insufficient to assess the trustworthiness of the statements Gaynor made to her as she did not testify at the hearing. The district court therefore did not abuse its discretion in excluding the third witness's testimony.

*The error was not harmless*

Any hearsay errors are evaluated for harmless error. *Walker*, 116 Nev. at 677, 6 P.3d at 481. Coleman contends that the exclusion of this evidence was not harmless. We agree. Because the exclusion of the defense evidence affected Coleman's constitutional right to a meaningful opportunity to present a complete defense, the error is only considered harmless if the court can determine "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman v. California*, 386 U.S. 18, 24 (1967). We cannot make this determination. This evidence was very important to Coleman's defense as it showed that he may not have been responsible for Tristen's burns, which were one of the two potential causes of Tristen's death. Considering the mitigating circumstance found by the jury of "[i]nvolvement of others in injuries to Tristen," we cannot conclude beyond a reasonable doubt that the jury would have found Coleman guilty of murder had they heard this testimony. Accordingly, this error was not harmless and warrants a new trial.

*Instructions on the felony-murder rule and child abuse*

Coleman argues that two instructions misled and confused the jury as they represented that a killing committed in the perpetration of child abuse is deemed to be murder of the first degree, even if the killing was accidental. The State asserts, and we agree, that the instructions accurately informed the jury that, while the killing can be accidental, the physical injury to the child (the child abuse) must be nonaccidental. Here, the jury was instructed that:

> There are certain kinds of murder which carry with them conclusive evidence of malice aforethought. One of these classes of murder is murder committed in the perpetration or attempted perpetration of child abuse. Therefore, a killing which is committed in the perpetration of child abuse is deemed to be murder of the first degree, whether the killing was intentional or unintentional or accidental. This is called the Felony-Murder Rule.

> The intent to perpetrate or attempt to perpetrate child abuse must be proven beyond a reasonable doubt.

Moreover, the jury was instructed that "[a] person commits child abuse if he willfully causes physical injury of a nonaccidental nature to a child under the age of 18 years."

These instructions comply with our statutory scheme concerning first-degree murder and child abuse. The instructions properly indicate that the child abuse must be nonaccidental and, to find murder in the first degree, the State must prove beyond a reasonable doubt that the murder was committed in the perpetration of child abuse. The death could have been intentional, unintentional, or accidental, but the child abuse must have been nonaccidental. As the State pointed out, the rationale

behind the felony-murder rule is "to deter felons from killing negligently or accidentally by holding them strictly responsible for the killings that are the result of a felony or an attempted one." *Payne v. State*, 81 Nev. 503, 506, 406 P.2d 922, 924 (1965). The instructions comport with our statutory scheme and the purpose behind the felony-murder rule.[4]

## CONCLUSION

We conclude that the district court's decision not to allow the testimony from two defense witnesses was an abuse of discretion and prejudiced Coleman. Accordingly, we reverse the judgment of conviction and remand for a new trial.

_____, J.
Cherry

We concur:

_____, J.
Hardesty

_____, J.
Parraguirre

---

[4]Because of our resolution of this appeal, we decline to reach Coleman's remaining contentions concerning the jury instructions.